UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

JOSEPH WADE,

                          Plaintiff,

        -v-

ROBERT J. RODRIGUEZ, *in his official capacity as Secretary of State, New York Department of State, et al.*,

                        Defendants.

23 Civ. 4707 (PAE)

OPINION & ORDER

------------------------------------------------------------

PAUL A. ENGELMAYER, District Judge:

Plaintiff Joseph Wade, proceeding *pro se*, brought this action against New York Secretary of State Robert J. Rodriguez and several other officials of the New York Department of State ("NYDOS"): David Ashton, in his official capacity as a revitalization specialist, Catherine Traina, in her official capacity as assistant director of the Bureau of Fiscal Management, and Laurissa Garcia, in her official capacity as a contract management specialist. His claims arise from the denial of a bid his company made to NYDOS for consulting services. He brings a range of claims. These include federal claims under 42 U.S.C. § 1983, alleging violations of equal protection and due process under the Fifth and Fourteenth Amendments; under 42 U.S.C. §§ 1985 and 1986, alleging conspiracy; and various state-law claims.

Currently pending are defendants' motion to dismiss Wade's Amended Complaint (the "Amended Complaint" or "AC") under Federal Rule of Civil Procedure 12(b)(1) for lack of jurisdiction, and under Rule 12(b)(6) for failure to state a claim, and Wade's motion to amend the AC. Before the Court is the June 28, 2024 Report and Recommendation of the Hon. Sarah L. Cave, United States Magistrate Judge, recommending that the Court grant the motion to dismiss and deny leave to amend. Dkt. 76 (the "Report"). For the reasons that follow, the Court adopts

1

the recommendations to grant the motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and to deny Wade leave to amend the AC.

I.  **Factual Background**[1]

The Court adopts the Report's detailed account of the facts and procedural history in substantial part. The following summary captures the limited facts necessary for an assessment of the issues presented.

**A.  Parties**

Wade is the sole owner of Owl Contracting LLC ("Owl Contracting"). Report at 1. In October 2022, he submitted a bid on behalf of Owl Contracting to NYDOS's Office of Planning, Development and Community Infrastructure ("OPDCI") for the opportunity to provide planning services for certain economic development projects in New York. Wade's bid was ultimately unsuccessful. Traina Decl. ¶¶ 2, 3, 22.

Rodriguez was the Secretary of State of New York at the time Wade submitted his bid. Ashton, Traina, and Garcia also all worked for NYDOS. Report at 1–2.

**B.  OPDCI's Call for Bids**

On September 16, 2022, the OPDCI released a Request for Proposals ("RFP") seeking bids for consultants to provide planning services for the "Downtown Revitalization Initiative" and the "New York Forward" program, to be administered in each of New York State's 10 economic development regions, for a term of up to five years. Traina Decl. ¶¶ 2–3. Both programs had the goal of spurring downtown recovery and revitalization across New York. *Id.* ¶¶ 2–4. A consultant whose proposal was picked would be responsible for helping local

---

[1] The Court draws the facts in this decision principally from the AC. Dkt. 31. For purposes of the motion to dismiss under Rule 12(b)(1), the Court may refer to evidence outside the pleadings. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). The Court, for this purpose, has considered the declaration of Catherine Traina. Dkt. 51 ("Traina Decl.").

2

planning communities complete a strategic investment plan. *Id.* ¶ 4. Preferred qualifications for potential candidates included: "knowledge and expertise in creating community development plans; land regulation; community planning, and functional expertise in information and economic analysis; policy analysis; construction and project cost estimation; public engagement and community outreach; report writing; sub-contracting; and process management." *Id.* ¶ 6.

The RFP requested that all bidders submit a Diversity Practices Questionnaire ("DPQ") with their proposal, as required by New York Executive Law Article 15-A and regulations promulgated by the Empire State Development's Division of Minority and Women's Business Development. *See id.* ¶ 7. The DPQ was designed to solicit information about a bidder's professional associations with certified minority- and women-owned business enterprises. The DPQ asked eight questions:

> 1. Does your company have a Chief Diversity Officer or other individual who is tasked with supplier diversity initiatives?
>
> 2. What percentage of your company's gross revenues (from your prior fiscal year) was paid to New York State certified minority and/or women-owned business enterprises as subcontractors, suppliers, joint-venturers, partners or other similar arrangement for the provision of goods or services to your company's clients or customers?
>
> 3. What percentage of your company's overhead (i.e., those expenditures that are not directly related to the provision of goods or services to your company's clients or customers) or noncontract-related expenses (from your prior fiscal year) was paid to New York State certified minority- and women-owned business enterprises as suppliers/contractors?
>
> 4. Does your company provide technical training to minority- and women-owned business enterprises?
>
> 5. Is your company participating in a government approved minority- and women-owned business enterprise mentor-protégé program?
>
> 6. Does your company include specific quantitative goals for the utilization of minority- and women-owned business enterprises in its non-government procurements?

3

> 7. Does your company have a formal minority- and women-owned business enterprise supplier diversity program?
>
> 8. Does your company plan to enter into partnering or subcontracting agreements with New York State certified minority- and women-owned business enterprises if selected as the successful Proposer?

Traina Decl., Ex. 2 ("DPQ") at 2–3. In addition to the DPQ, a bidder was also required to submit a technical proposal and a cost proposal. Traina Decl. ¶ 13.

All bids judged to have fulfilled the submission requirements were evaluated by NYDOS. *Id.* ¶ 14. To be eligible for an award under the RFP, bids were required to score a minimum of 55 points (out of 78 total points) on the technical proposal. *Id.* ¶ 16. Bidders that received at least 55 points on the technical proposal then had their full bid—the technical proposal, cost proposal, and DPQ—evaluated and scored out of 100 points. *Id.* ¶ 15. The technical proposal could receive up to 78 points; the cost proposal could receive up to 20 points; and the DPQ could receive up to 2 points. *Id.* The contract was awarded to the bidder who had the highest overall score—by totaling the three categories—for each program in each region. *Id.* ¶ 16. The technical proposal, cost proposal, and DPQ were separately evaluated. *Id.* ¶ 17. The technical proposal was reviewed and scored by three revitalization specialists; the applicant's final score was the average of the specialists' three scores. *Id.* The cost proposal was reviewed and scored by the assistant director of the Bureau of Fiscal Management. *Id.* The DPQ was reviewed and scored by a contract management specialist. *Id.*

### C. Wade's Bid on Behalf of Owl Contracting

On October 28, 2022, Wade submitted an RFP on behalf of Owl Contracting for the New York Forward Program in the Finger Lakes and Southern Tier. *Id.* ¶¶ 22–23. In Wade's DPQ, he answered "No" or "None" for each question posed. *Id.* ¶ 28. Owl Contracting's technical proposal was reviewed by three separate evaluators. *Id.* ¶ 25. Out of the available 78 points, it

4

received a score of 17.67, which reflected an average of three specialists' three scores of 13, 23, and 17. *Id.* Because Wade's technical proposal fell short of the minimum score of 55 points, his bid was not eligible for an award.[2]

On December 13, 2022, Wade received a letter informing him that Owl Contracting had not been awarded a contract in connection with the RFP. *Id.* ¶ 29.

## II. Procedural History

On June 5, 2023, Wade, *pro se*, filed the Complaint. Dkt. 1. On August 1, 2023, the Court *sua sponte* dismissed the claims against OPDCI as barred by Eleventh Amendment immunity. Dkt. 8. But, because the Eleventh Amendment did not bar Wade from bringing claims against state officials for prospective injunctive relief, the Court construed the Complaint as also asserting claims against the defendants in their official capacity seeking injunctive relief. *Id.* at 4 (citing *Ex Parte Young*, 209 U.S. 123 (1908)). The Court also referred the case to Magistrate Judge Cave for pre-trial management. Dkt. 7.

On November 30, 2023, defendants filed a motion to dismiss. Dkt. 20. On December 1, 2023, the Court issued an amend or oppose order, Dkt. 26, and issued an amended order of reference, referring the motion to dismiss to Judge Cave for a Report and Recommendation, Dkt. 27.

On December 21, 2023, Wade filed the AC, the operative complaint today. Dkt. 31. On February 12, 2024, defendants filed a motion to dismiss the AC, Dkt. 49, a supporting memorandum of law, Dkt. 50 ("Def. Mem."), and a declaration, Dkt. 51 ("Traina Decl."). On

---

[2] Owl Contracting's DPQ received a score of zero (out of two possible points). Traina Decl. ¶ 28. Its cost proposal received a score of 20 (out of 20 possible points). *Id.* ¶ 27. These two scores were ultimately not a factor in NYDOS's rejection of Owl Contracting's bid because, as explained above, the bid's technical proposal did not meet the 55-point minimum requirement. *Id.* ¶ 26.

February 13, 2024, the Court issued an amended order of reference, referring the motion to dismiss to Judge Cave for a Report and Recommendation. Dkt. 55.[3] On March 12, 2024, Wade filed a memorandum of law in opposition. Dkt. 72 ("Pl. Opp."). On March 27, 2024, defendants filed a reply. Dkt. 74 ("Reply").

On March 12, 2024, Wade filed a "Motion to Add Parties," seeking to add claims for monetary damages against Rodriguez, Ashton, and Traina in their individual capacities and to add an official capacity claim against non-party Sandra Nolan. Dkt. 67. On March 19, 2024, Judge Cave denied the motion. Dkt. 73.

On June 28, 2024, Judge Cave issued a Report and Recommendation. Dkt. 76. It recommends that defendants' motion to dismiss be granted on three independent grounds: because (1) Wade lacks Article III standing; (2) Wade's claims are barred by Eleventh Amendment immunity; and (3) the AC's federal-law claims fail to state a claim under Rule 12(b)(6). The Report also recommends that leave to amend be denied, and the AC be dismissed with prejudice. Finally, the Report recommends that the Court not exercise supplemental jurisdiction over the state law claims.

On July 1, 2024, Wade filed his objections to the Report, Dkt. 78, and a declaration in support, Dkt. 79. On July 8, 2024, he filed a corrected version of his objections. Dkt. 80 ("Objs."). On July 30, 2024, defendants filed a memorandum of law in opposition to Wade's objections. Dkt. 84. On July 31 and August 21, 2024, Wade filed two additional memoranda of law. Dkts. 86, 90.[4] On July 31, 2024, Wade also filed a motion for leave to amend his AC, Dkt.

---

[3] Upon the filing of the motion to dismiss, Judge Cave issued an order denying the earlier motion to dismiss as moot. Dkt. 54.

[4] The Court here considers Wade's corrected objections filed on July 8, 2024, which were filed within 14 days of the Report's issuance on June 28, 2024. See Report at 33. The Court does not,

6

87, and a declaration in support, Dkt. 88.

### III. Applicable Legal Standards

#### A. Report and Recommendation

In reviewing a Report and Recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When specific objections are timely made, "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3); *see also United States v. Male Juv.*, 121 F.3d 34, 38 (2d Cir. 1997). "To accept those portions of the report to which no timely objection has been made, a district court need only satisfy itself that there is no clear error on the face of the record." *Ruiz v. Citibank, N.A.*, No. 10 Civ. 5950 (KPF) (RLE), 2014 WL 4635575, at *2 (S.D.N.Y. Aug. 19, 2014) (quoting *King v. Greiner*, No. 02 Civ. 5810 (DLC), 2009 WL 2001439, at *4 (S.D.N.Y. July 8, 2009)); *see also, e.g., Wilds v. United Parcel Serv.*, 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003).

If a party objecting to a Report and Recommendation makes only conclusory or general objections, or simply reiterates its original arguments, the Court will review the Report strictly for clear error. *See Dickerson v. Conway*, No. 08 Civ. 8024 (PAE), 2013 WL 3199094, at *1 (S.D.N.Y. June 25, 2013); *Kozlowski v. Hulihan*, Nos. 09 Civ. 7583, 10 Civ. 0812 (RJH) (GWG), 2012 WL 383667, at *3 (S.D.N.Y. Feb. 7, 2012). This is so even in the case of a *pro se* plaintiff. *See Telfair v. Le Pain Quotidien U.S.*, No. 16 Civ. 5424 (PAE), 2017 WL 1405754, at *1 (S.D.N.Y. Apr. 18, 2017) (citing *Molefe v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009)). Furthermore, "[c]ourts generally do not consider new evidence raised in

---

however, consider Wade's memoranda filed on July 31 and August 21, 2024, because these were untimely filed, well after the deadlines Judge Cave set in her Report.

objections to a magistrate judge's report and recommendation." *Tavares v. City of New York*, No. 08 Civ. 3782 (PAE), 2011 WL 5877548, at *2 (S.D.N.Y. Nov. 23, 2011) (collecting cases).

### B. Motion to Dismiss Under Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova*, 201 F.3d at 113 (2d Cir. 2000) (citation omitted). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted). "[J]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Id.* (citation omitted). Additionally, a court may properly refer to matters outside the pleadings when considering the existence of jurisdiction on a motion pursuant to Rule 12(b)(1). *See Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1010–11 (2d Cir. 1986).

## IV. Discussion

The Court adopts the Report's recommendation to dismiss the AC under Rule 12(b)(1), for lack of subject matter jurisdiction. As the Report recognized and as the Court explains below, Wade lacks Article III standing to bring his section 1983 claim based on an alleged violation of equal protection. Separately, the Eleventh Amendment bars the AC in its entirety because the AC exclusively brings claims for monetary relief against the defendants—state officials—in their official capacities.

### A. Article III Standing

Article III limits the federal judicial power to deciding cases and controversies. *Soule v. Connecticut Ass'n of Sch., Inc.*, 90 F.4th 34, 45 (2d Cir. 2023). "Under Article III, a case or controversy can exist only if a plaintiff has standing to sue," meaning a personal stake in the

8

outcome of the litigation. *United States v. Texas*, 599 U.S. 670, 675 (2023). The "irreducible constitutional minimum" of Article III standing consists of three elements. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). A plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citation omitted). Moreover, "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (citation omitted).

The AC articulates two theories of how alleged violations of equal protection by NYDOS ostensibly injured Wade. First, it alleges that NYDOS subjected Wade to disparate treatment based on his race and gender by forcing him to submit, as part of his bid, a DPQ, which asked questions about Owl Contracting's diversity practices. *See* AC at 13 ("I have been deprived of my fundamental rights and liberties in respect to my race and gender."). The AC alleges that, by being directed to respond to these questions, Wade was discriminated against as a white man on the basis of his race and gender. Second, it alleges, the diversity questionnaire caused Wade to participate in a discriminatory process that forced him to discriminate against his subcontractors on the basis of race and gender. *See* AC at 20 ("Causing me to subject other citizens to judgment in a way in which deprives those citizens of opportunity based on their race and gender."). On neither theory does the AC plead facts satisfying Article III standing.

The first theory of harm fails to plead a cognizable injury in fact. In *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993), the Supreme Court analyzed an equal protection challenge to a city program providing preferential treatment to minority-owned businesses in the award of government

contracts. The Supreme Court held that an "injury in fact" in this context means "the inability to compete on an equal footing in the bidding process, not the loss of a contract." *Id.* at 666 (citation omitted). The Court explained:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

*Id.* (citation omitted).

Here, however, the AC does not plead that Wade competed in the bidding process on an unequal footing. As pled, although Wade submitted a DPQ and NYDOS scored the DPQ, the DPQ score did not having any bearing on NYDOS's decision to deny Wade's bid. That is because his technical proposal, a threshold part of his bid, failed to meet the 55-point minimum that would have enabled the bid to advance to the next stage at which the DPQ score would have been taken into account. Wade's technical proposal received a score of 17.67—far short of the 55-point minimum required—such that his bid was automatically ineligible and screened out of the bidding process. As such, it did not advance to the stage at which NYDOS would have considered the balance of Wade's bid, including the DPQ. Wade's DPQ score thus did not play any role in the rejection of his proposal. In addition, even if Wade's DPQ had been considered, his claim to have been treated differently on the basis of *his* gender or race would still fail, because the DPQ did not ask questions about the race or gender of the contractor (Owl Contracting) or its principal (Wade). It instead inquired about the contractor's business practices, in particular, whether it employed subcontractors that are certified as "minority and/or women-owned business enterprises." Traina Decl., Ex. 2 at 2. As such, Wade cannot claim that

10

DPQ served as a barrier that made it more difficult for *him*, as a member of a group that the DPQ allegedly disfavored, to compete for a government benefit because of *his identity*. Accordingly, the AC does not plead that Wade suffered any injury—any deprivation to his ability to compete on an equal footing in the bidding process.

The AC's second theory of harm is that NYDOS "caus[ed] [Wade] to subject other citizens to judgment . . . which deprives those citizens of opportunity based on their race and gender." AC at 20. This allegation is hazy at best. Construed most favorably to Wade, the AC appears to allege that NYDOS in some manner encouraged Wade to "discriminate against others based on their race or sex." *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 707 (9th Cir. 1997). Some courts have held that "[a] person suffers injury in fact if the government requires or encourages as a condition of granting him a benefit that he discriminate against others based on their race or sex." *Id.*; *see also Lutheran Church-Missouri Synod v. F.C.C.*, 141 F.3d 344, 350 (D.C. Cir. 1998) ("[F]orced discrimination may itself be an injury."); *Safeco Ins. Co. of Am. v. City of White House, Tenn.*, 191 F.3d 675, 689 (6th Cir. 1999) (same). *But see Dunnet Bay Const. Co. v. Borggren*, 799 F.3d 676, 693 (7th Cir. 2015) (rejecting "*Monterey Mechanical*'s broad view of standing" because it "collapsed third-party standing into Article III standing"). But even assuming this to be a viable species of injury in fact, the AC does not plead concretely how Wade was forced, by the existence of the DPQ, to discriminate against certain subcontractors such that they were "deprived . . . of opportunit[ies] based on their race and gender." AC at 20. It does not allege, for example, that Wade was even aware of the DPQ at any time when he made subcontracting decisions, let alone that the existence of a DPQ influenced his subcontracting (or other) decisions. On the contrary, in filling out the DPQ for Owl Contracting, Wade responded "no" or "none" to every question the DPQ posed. These

11

inquired, for example, whether Owl Contracting had a chief diversity officer, what percentage of Owl Contracting's gross revenue was paid to certified minority- and/or women-owned business enterprises as subcontractors, what percentage of Owl Contracting's overhead or noncontract-related expenses were paid to certified minority- and women-owned business enterprises as suppliers and contractors, and whether Owl Contracting provided technical training to minority- and women-owned business enterprises. Wade's "no" or "none" answers to these questions are inconsistent with his claim to have been injured by having been forced to conform his practices to the ostensibly discriminatory preferences embedded in the DPQ.

Even if the AC were construed to claim that Wade, now aware of the DPQ, may be encouraged to consider race and gender in future subcontracting decisions, the AC still would not plead the necessary ingredients of Article III standing. That is because the relief (money damages) it seeks is backward-looking. It is limited to compensating Wade for the *past* injury he claims from the failure to be awarded the RFP contract. *See* AC 34–52. The AC does not seek relief from injuries that could arise from Wade's participation in future bid processes involving the DPQ. Any such injuries thus cannot "be redressed by a favorable judicial decision" here. *Spokeo*, 578 U.S. at 338; *cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998) (plaintiff lacks standing where relief sought—mainly injunctive and declaratory relief—"cannot conceivably remedy any past wrong"); *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432 (2001) (compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct").[5]

---

[5] The AC contains three stray references to "declaratory relief." None, however, specifies the declaratory relief sought, save that at one point, the AC, confusingly, identifies the "declaratory redress" as monetary damages of "$200,000." AC at 43. In any event, read grammatically, each appears to relate to the denial of Wade's earlier bid, not to future bids. *See* AC at 21 ("For the deprivation inflicted upon me by the harms above, I claim civil injury, harm and damage, and

The Court thus adopts the Report's recommendation that it find Article III standing lacking with respect to the AC's section 1983 claim based on an asserted equal protection violation.

## B. Eleventh Amendment Immunity

The Court also adopts the recommendation to find that the Eleventh Amendment bars all claims in the AC, because each sues state officials in their official capacities solely for damages. As the Report explains, when "a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993) (citation omitted). The Eleventh Amendment, however, does not bar suits against state officers in their official capacity for prospective injunctive relief. *See Ex parte Young*, 209 U.S. at 155–56.

When Wade filed the Complaint, the Court initially construed it to assert official-capacity claims against Rodriguez seeking prospective injunctive or declaratory relief, such that these claims would not be barred by the Eleventh Amendment. But Wade's AC, today the operative complaint, seeks only monetary relief from defendants and only in their official capacities.[6] It does not seek any defined injunctive or declaratory relief. As such, its claims are barred by the Eleventh Amendment. *See, e.g., Auguste v. Dep't of Corr.*, 424 F. Supp. 2d 363, 367 (D. Conn.

---

pray for declaratory and compensatory relief."); *id.* at 31 ("Similarly, descriptions of instances of proximate causes with grounds for redress and reasoning for compensatory and declaratory relief."); *id.* at 43 ("For subjecting me actively to the 'increase in risk' and cheapening the aspects discussed above, I propose the following declaratory redress, $200,000.")

[6] As explained above, see *supra* note 5, the AC seeks only damages, *see* AC 31–52 (calculation of damages). It does not mention injunctive relief. And it refers only conclusorily to "declaratory relief" without specifying what such relief would be. The AC nowhere states that it is suing defendants in their individual capacities. Instead, it repeatedly refers to defendants "in their official capacities." *See* AC at 1, 8, 9, 21, 26, 30, 46.

13

2006) (holding that plaintiff's claims for monetary damages against defendants in official capacities are barred by the Eleventh Amendment); *Gutierrez v. Joy*, 502 F. Supp. 2d 352, 362 (S.D.N.Y. 2007) (same).

Wade objects to this conclusion by asserting that New York has waived its Eleventh Amendment immunity, and that Congress has abrogated sovereign immunity. These arguments fail. New York State has not waived its sovereign immunity or otherwise consented to this present suit, and Wade does not specify a context in which New York State ostensibly did so. Nor has Congress abrogated the states' Eleventh Amendment immunity, including in enacting section 1983. *See Quern v. Jordan*, 440 U.S. 332, 344–45 (1978) (holding that 42 U.S.C. § 1983 does not abrogate states' Eleventh Amendment immunity).

Wade, in his objections, next moves to amend the AC to include a prayer for injunctive relief. Objs. at 4–5; Dkt. 87 (motion to amend). A party, however, ordinarily cannot move to amend a complaint in his objections to a Report and Recommendation. *See, e.g., Clarke v. United States*, 367 F. Supp. 3d 72, 75 (S.D.N.Y. 2019) (in ruling on objections, holding that, because "new claims may not be raised properly at this late juncture," such claims "presented in the form of, or along with, 'objections,' should be dismissed"). The circumstances here make permitting an amendment particularly unwarranted. Wade has already amended his complaint "once as a matter of course" as permitted under Federal Rule of Civil Procedure 15(a)(1). Thus, the motion to amend is governed by Rule 15(a)(2), which provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave" and that "[t]he court should freely give leave when justice so requires." *Id.* A court may deny leave to amend for "good reason"—"futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

14

The Court adopts the Report's recommendation that leave to amend be denied. As the Report recognizes, when Wade amended his initial Complaint, he had the guidance of the Court that the Eleventh Amendment bars suit for monetary damages against the defendants in their official capacities. *See* Dkt. 8. In amending, Wade chose to not heed this guidance. For this reason, the Report recommends that Wade's present motion to amend—for the sole purpose of adding claims for injunctive relief to avoid defendants' Eleventh Amendment immunity—be denied. *See McDonald v. Head Crim. Ct. Supervisor Officer*, 850 F.2d 121, 124 (2d Cir. 1988) (although *pro se* litigants deserve more lenient treatment than those who are represented, "all litigants, including *pro se* [litigants], have an obligation to comply with court orders").

In his objections, Wade does not engage with the Report's reasoning. He merely reprises his request to amend the AC on this point.[7] The Report's recommendation to deny leave to amend is thus subject to clear error review on this point. *See, e.g., Jackson v. Graham*, No. 16 Civ. 9595 (WHP) (DCF), 2019 WL 3817196, at *2 (S.D.N.Y. Aug. 14, 2019) (reviewing Report for clear error where objections do not address Report's reasoning); *New Amsterdam Cap. Partners, LLC v. Krasovsky*, No. 12 Civ. 7621 (VSB) (HP), 2017 WL 87050, at *3 (S.D.N.Y. Jan. 10, 2017) (reviewing Report for clear error where objections do not address the findings or conclusions of the Report). The Court finds that the Report's recommendation is not only not facially erroneous—it is clearly correct—and adopts that recommendation.

In sum, the Court holds that, because the AC solely seeks monetary relief from defendants in their official capacities, the Eleventh Amendment bars the present suit, and the

---

[7] Wade initially moved to amend his Amended Complaint in his objections. Later, on July 31, 2024, after the Report had been issued and the parties' objections and responses were filed, he moved again to amend his Amended Complaint. *See* Dkt. 87.

Court accordingly lacks subject matter jurisdiction. The Court declines to grant Wade leave to amend to attempt to correct that deficiency.

## CONCLUSION

For the reasons stated herein, the Court grants defendants' motion to dismiss under Rule 12(b)(1) and denies Wade's motion to amend the Amended Complaint. Because the Court dismisses the case under Rule 12(b)(1), the Court does not reach defendants' motion to dismiss based on Rule 12(b)(6). Because the dismissal is based on a lack of subject matter jurisdiction, it is without prejudice to Wade's right to bring a separate lawsuit as to which subject matter jurisdiction exists. *See, e.g., J. J. Cranston Constr. Corp. v. City of New York*, 602 F. Supp. 3d 373, 379 n.9 (E.D.N.Y. 2022) ("Dismissal for lack of subject matter jurisdiction must be without prejudice."); *Hernandez v. Conriv Realty Assocs.*, 182 F.3d 121, 123 (2d Cir. 1999) ("[W]here a court lacks subject matter jurisdiction, it also lacks the power to dismiss with prejudice."); *Siegel v. Apergis*, 610 F. App'x 15, 16 (2d Cir. 2015) ("Our precedent instructs that when a court dismisses for lack of subject-matter jurisdiction, that dismissal must be without prejudice.").

The Clerk of the Court is respectfully directed to terminate the motions pending at Dockets 49 and 87 and to close this case.

SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: September 10, 2024
      New York, New York